[L. A. No. 7095. In Bank.—September 1, 1922.]

## ANGELO DOMENIGONI, Appellant, v. IMPERIAL LIVE STOCK & MORTGAGE COMPANY (a Corporation), Respondent.

[1] Corporations—Sale of Stock—Violation of Permit of Corporation Commissioner—Void Purchase Money Notes.—Under a permit of the commissioner of corporations authorizing a sale of stock at par "upon subscription agreements providing for the payment of 25 per cent of the subscription price in cash, and the execution of promissory notes bearing interest at 6 per cent by the subscriber for the balance," a sale of stock by an agent of the corporation for which the purchaser gave his note payable directly to the corporation for three-fourths of the price and another note for the remaining one-fourth due six months after date payable to himself and indorsed in blank and delivered to the agent, who a month afterwards discounted the latter note at a bank, was in violation of the permit and illegal and void, in the absence of proof that the purchaser made such agent his agent and authorized him to cash the note for the purpose of paying the twenty-five per cent of the price as required by the permit.

[2] Id.—Denial of Relief—Parties in Pari Delicto.—Such a transaction being an attempt to circumvent the law and the purchaser being equally guilty with the corporation, he is not entitled to any relief even if the point is not raised.

APPEAL from a judgment of the Superior Court of Riverside County. W D Dehy, Judge Presiding Reversed.

The facts are stated in the opinion of the court.

Thomas T. Porteous for Appellant.

Marshall Stimson and Noel C. Edwards for Respondent.

SHAW, C. J.—This is an action to cancel and have delivered up to the plaintiff certain promissory notes delivered by plaintiff to the defendant, and also certain agreements by plaintiff with defendant for the purchase of stock of said defendant. The right of the plaintiff depends upon the provisions of the law for the regulation of corporations, approved May 18, 1917 (Stats. 1917, p. 673), usually known as the "Blue Sky Law." His contention is that the notes and agreements were made in violation thereof and that therefore they are against the policy of the law (Civ. Code, secs. 1550, 1668) and void.

This statute provides that no corporation shall sell its capital stock, except for a delinquent assessment, until it has secured from the commissioner of corporations a permit authorizing it to do so (sec. 3), and that the permit, when issued, shall authorize the corporation to issue and sell its "securities" . . . "in such amounts and for such considerations and upon such terms and conditions as the commissioner may in said permit provide" (sec. 4). The word "security" as defined in section 2 includes shares of the capital stock of the corporation which makes such sale. The act also provides that every corporation "which shall directly or indirectly issue or cause to be issued, any security contrary to the provisions of this act . . . or in nonconformity with a permit of the commissioner authorizing the same" is punishable by a fine not exceeding $10,000 (sec. 13); also that any agent of such company who does the like is guilty of a felony (sec. 14).

In pursuance of this act the corporation commissioner on December 30, 1919, issued to the defendant a permit granting it the right to sell 190,000 shares of its capital stock, at par, "upon subscription agreements providing for the payment of 25 per cent of the subscription price in cash, and the execution of promissory notes bearing interest at 6 per cent, by the subscriber for the balance," at the price of $10 per share, that being its par value. Under this permit the defendant sold to the plaintiff 2,000 shares of its stock at the price of $10 per share, by four separate sales; the first being a sale of 250 shares on June 10, 1920, the second for 250 shares on July 10, 1920, the third for 500 shares on October 19, 1920, and the fourth for 100 shares on November 17, 1920.

The plaintiff claims that each of these sales were made in consideration of his note for one-fourth of the price made payable to himself, indorsed by him, and delivered by him to the agent of the defendant, and another note for three-fourths of the price payable directly to the defendant, and that in neither instance did he pay the one-fourth of the price in cash. The defendant, on the other hand, claims that on each occasion the plaintiff agreed to pay one-fourth of the price in cash, executed his note for a sum equal to such one-fourth, payable to himself, and indorsed and delivered the same to one W. B. Lawrence; that he thereupon authorized Lawrence, in his behalf and as his agent, to sell said note at a bank for cash to raise the money necessary to make the cash payment by Domenigoni and, for him, to apply such cash in payment of the one-fourth part of the purchase price of the stock then sold, and that Lawrence, in accordance therewith, made the sale and paid the money to the defendant in satisfaction of that part of the purchase price.

The court made findings in favor of the defendant on this proposition, stating specifically therein with respect to each sale that "the plaintiff made the said W. B. Lawrence his agent and authorized him to cash the said note, . . . , for the purpose of paying the first installment of the subscription agreement of even date with said note which plaintiff executed at said time." The judgment went for the defendant and the plaintiff appeals.

The only question arising upon the appeal is the sufficiency of the evidence to sustain the finding of the court just quoted. The issuance and sale by the defendant of its capital stock, or an agreement for such sale, in a manner not in conformity with the permit issued to it by the commissioner of corporations, would be illegal and void. The permit so issued required that the agreement of sale of the stock should provide "for the payment of twenty-five per cent of the subscription price in cash" and for the execution of notes by the purchaser for the balance. A sale made in consideration of a price, all of which was represented by notes given by the purchaser to the defendant or its agents, would be contrary to the permit. The sufficiency of the evidence to support this finding depends upon its sufficiency to show that the note for one-fourth of the price

of each sale, given at the time thereof, was a note given to an agent of the defendant corporation in consummation of the sale, or a note executed by the plaintiff to his own agent authorized to sell the note for its face value and apply the proceeds upon the cash payment by transmitting the same for plaintiff to the defendant.

The facts bearing on this question are in the main not contradicted.

One C. H. McPhail was employed by the defendant as its exclusive agent to sell the 190,000 shares of stock above mentioned. The agreement provided that the defendant was to furnish McPhail with all statements and literature for any advertising campaign that McPhail should undertake in selling said stock, and that McPhail should use and make no statements or representations to any prospective purchaser, other than those contained in the literature so furnished. C. W. Francis was the manager for McPhail in selling said stock. Three agents appointed by McPhail or Francis were instrumental in negotiating the sales to the plaintiff, namely, W. B. Lawrence, Charles O. Harding and James W. Lynch. Lawrence was present at the time each of the sales was made, Harding at the first two and Lynch at the third and fourth. Harding and Lawrence first saw the plaintiff some time in April, 1920, and suggested to him the purchase of this stock. The plaintiff then expected to sell his farm for a considerable sum of money and expressed his desire to make an investment in case he sold it. The transactions with respect to each sale, as the evidence discloses, were precisely similar in all essential particulars, and the relation of one will suffice for all. On June 10, 1920, Lawrence and Harding visited the plaintiff at his residence. They had been furnished by McPhail with a supply of forms for the transaction then entered into. These included notes payable to "myself," payable in six months, other notes payable to the defendant by name, and forms of authorization as hereinafter shown. They also included a form of subscription agreement providing for the payment of the price "not less than one-fourth cash accompanying this application, and the balance thereof as evidenced by promissory note of even date herewith, bearing interest at the rate of six per cent per annum"; and a form of receipt to the purchaser as hereinafter given.

On that occasion they obtained from the plaintiff his signature to an agreement in the form above stated for the purchase of 250 shares of stock and his note payable to the defendant for $1,875; also his note payable in six months to himself on one of the "myself" forms and his indorsement thereon, which note he then delivered to said Lawrence; also his signature to one of the authorization agreements aforesaid in the following words:

"June 10, 1920.

"To Any Bank or Banker:

"You are at liberty to purchase my note of this date for $625.00 given to W. B. Lawrence if you desire.

"There are no offsets or conditions against this note.

"Angelo Domenigoni."

They also executed to him a receipt as follows:

"Receipt to be given subscriber.

"June 10, 1920.

"Received of Angelo Domenigoni of Winchester, Calif., the sum of twenty-five hundred——dollars.  Cash, $625; notes $1875.

"Payable to Imperial Live Stock & Mortgage Company as payment for two hundred and fifty (250) shares of the capital stock of the Imperial Live Stock & Mortgage Company, as set forth in this subscription contract, numbered the same as the receipt and bearing even date herewith. Imperial Live Stock & Mortgage Company.

"(Not valid unless signed.)

"Harding & Lawrence,

"Special Agents."

The only evidence in regard to the proposition that the plaintiff then appointed Lawrence as his own agent to obtain the money for him on the "myself" note and make payment of one-fourth of the price therewith, is the testimony of Lawrence, Harding and Lynch, together with the contents of the documents aforesaid.  Lawrence testified that the plaintiff read the agreement of subscription and the two notes, that he then explained to the plaintiff that it would be necessary for him to pay one-fourth cash, that the balance could be taken in notes which could be carried by the company as long as he desired, provided he paid the interest, and that he, Lawrence, would "renew his original

first payment note, if he so desired,'' referring to the ''myself'' note for one-fourth of the price. His testimony as to his authorization to act as agent for plaintiff consisted of the following questions and answers:

''Q. Did you tell him by what method you expected to raise the money on his 'Myself' notes?

''A. I told him in lieu of cash, it was necessary for us to discount all notes.

''Q. Did you tell him that you would have to act for him in cashing that note?

''A. I told him I would discount these notes.''

Harding testified on this subject that all the details were explained to the plaintiff, and that he was told that if he wanted this stock ''we could arrange it so that he would make a cash payment, and that would be upon making this 'Myself' note, which was different entirely from the note which was part of the application. Then his 'Myself' note was supposed to cover the first payment, and be converted into cash through discount at a bank by Mr. Lawrence and myself.

''Q. Acting for whom?

''A. Acting for ourselves or for him. It was simply a case of getting him the money to make the first payment.''

The plaintiff testified that he gave the two notes for the entire purchase price of the stock, and that he paid nothing in cash at the time of either purchase. Immediately after the purchase on each occasion the two agents departed with all the papers except the receipt. The ''myself'' notes of June 10 and July 10 were both sold on July 12, 1920, for their face values to the First National Bank at Hemet by Lawrence and he thereafter in due course transmitted the money to McPhail, together with the subsequent agreements and the other notes for the remainder of the price. The money obtained from the bank in Hemet was reported to the defendant's main office by McPhail or Lawrence, or both, as cash paid on the price of the stock sold on each occasion.

[1] From the foregoing statement of the facts proven, it is plain that the transactions in question were planned and executed in the endeavor to circumvent the statute and evade the requirements of the permit allowing the defendant to sell this stock. McPhail was the exclusive and general agent of the defendant. It had agreed to make no sales

thereof save through his agency. In carrying out his duties as agent it was necessary for him to have solicitors and salesmen to procure purchasers and make sales. He had appointed Lawrence, Harding and Lynch as such salesmen, and had furnished them with a supply of the forms aforesaid, to enable them to carry out the plan in the manner here exhibited. He must be deemed to have intended they should do so and to have authorized them to carry out the plan. These salesmen were the agents of the defendants for that purpose. The legal results are, therefore, the same as if the transaction had been carried out directly between Domenigoni on the one side and the managing agent of the defendant on the other, which was the same in effect as if it had been done by the defendant through the board of directors. .

The permit authorized agreements of sale of the stock only upon the condition that one-fourth of the price was paid in cash at the time of its execution. The written agreements made in this case did, in form, declare that one-fourth should be paid in cash, but this provision was not fulfilled nor intended to be fulfilled. The cash was not paid. Instead, the plaintiff executed a note payable six months afterward to himself, indorsed it in blank, and delivered it to Lawrence, one of the defendant's agents engaged in negotiating the sale. The first payment, so far as Domenigoni, the payor, was concerned, was not made in cash, and would not be made by him until the six months expired. The permit did not specify that the defendant could accept a note instead of the cash payment, or that it would be allowed to do so provided it could negotiate the note and procure the cash by that means. Yet the latter is precisely what was done. Domenigoni's note was accepted by defendant's agents and it was not until a month later that the cash was obtained on it.

To say that Lawrence was appointed by Domenigoni as his own agent to take his note to some bank and there obtain the cash, if he could, and then use it, for Domenigoni to pay for him the cash necessary to complete the transaction, would sanction a mere pretense of conformity to the statute and the permit. The transaction with Domenigoni was complete when the agents, after giving him a receipt for "cash $625," departed with his note for that sum due in six

months, and no cash. There is no substantial evidence that he authorized Lawrence to cash the note for him, or that he ever supposed that to be the relation between them, even if so plain an evasion could be tolerated by the courts. The agreement of sale and the receipt, each bears the signature "Harding & Lawrence, Special Agents" subscribed thereto. They were the active agents for the defendant, the seller, in the matter. Neither of these agents was willing to testify that he undertook to act also as the agent of the buyer, or that any suggestion to that effect was made to the buyer. When Lawrence was asked if he told Domenigoni that he would "have to act for him in cashing that note," his answer was: "I told him I would discount these notes." This was a plain evasion of the question and it shows that the statement embraced in the question was not made. The statement that he would "discount the notes" does not imply that he said he would do so for Domenigoni, but, especially when made in answer to such a question, clearly implies that he made no such statement. Harding's testimony does not go as far as that of Lawrence. His testimony that in converting the "myself" note into cash to cover the first payment he and Lawrence would be "acting for ourselves or for him," is entirely noncommittal and scarcely rises to the dignity of a conclusion, much less a statement of fact.

The plain facts were that in each case Domenigoni made an agreement to subscribe for stock which upon its face stated that one-fourth of the price was to be paid in cash, but, in fact, he gave his note, due six months thereafter, for the one-fourth and another note for the balance, payable in installments at later dates, and the agents of the defendant thereafter sold the six months' notes and thereby obtained the cash wherewith and whereby the transaction might appear on the books of the defendant as a sale for one-fourth cash. The agents accepted the six months' note on behalf of themselves as agents for the defendant, and the subsequent sale thereof by them was in legal effect a sale by defendant, whether its directors and managing officers were aware of the details of the transaction or not. Its general agent, McPhail, is charged with full knowledge of it, for he prepared the papers required for its execution. If such subterfuges were permitted, the statute would soon become a dead letter and

the object it was designed to accomplish would be frustrated by the very persons against whose practices it is directed.

Therefore the court below erred in its findings. As to each case the court found that the plaintiff delivered the "myself" note to W. B. Lawrence as his agent, that defendant received from Lawrence the amount of said "myself" note in cash at the time said note was so delivered to Lawrence, that the defendant did not agree with plaintiff that if plaintiff would purchase the stock he could give notes for the full amount of the purchase price thereof, that it is not true that the whole purchase price of said stock was paid in promissory notes of the plaintiff, and that plaintiff made said Lawrence his agent, and authorized him, as such, to cash the said "myself" notes for the purpose of paying the first installment of the subscription agreement of the same date, and that defendant received the sum of twenty-five per cent of each installment of such stock sold to plaintiff in cash.

The court should have found that when each stock sale was made the plaintiff agreed to execute notes for the full price, three-fourths of the purchase price by the notes payable to defendant and the other one-fourth by the "myself" notes, and that said last-mentioned notes, though made to himself and indorsed in blank by him, were also delivered to plaintiff through the medium of Mr. Lawrence, who was the defendant's agent to receive them, and obtain the money on them, and not the agent of the plaintiff.

[2] But it does not follow that the plaintiff was entitled to any relief. The entire transaction was an attempt to circumvent the law. The notes and agreements were each of them made in violation thereof and are therefore against the policy of the law, as he claims, and void. He was a party to them and is equally guilty with the defendant. In such a case the court will give no relief even if the point is not raised by either party. In *Kreamer* v. *Earl*, 91 Cal., at page 118 [27 Pac. 737], the court said: "It may be suggested that the appellant has never questioned the legality of the contract; and that we ought not to make the point for him . . . A court of equity will not allow itself to become a handmaid of iniquity of any kind. It intervenes, not for the sake of the party who is benefited by the intervention, but for the sake of the law itself. It

matters not that no objection is made by either party; when the court discovers a fact which indicates that the contract is illegal and ought not to be enforced, it will, of its own motion, instigate an inquiry in relation thereto.'' (To the same effect, see *Valentine* v. *Stewart,* 15 Cal. 404; *Abbe* v. *Marr,* 14 Cal. 211; *Davis* v. *Mitchell,* 34 Cal. 89–90; *Prost* v. *More,* 40 Cal. 348; *Bulson* v. *Moffatt,* 173 Cal. 686 [161 Pac. 259]; *Colby* v. *Title etc. Co.,* 160 Cal. 640 [Ann. Cas. 1913A, 515, 35 L. R. A. (N. S.) 813, 117 Pac. 913]; *Ripperdan* v. *Weldy,* 149 Cal. 676 [87 Pac. 276]; *Los Angeles* v. *City Bank,* 100 Cal. 24 [34 Pac. 510]; *McGregor* v. *Donnelly,* 67 Cal. 149 [7 Pac. 422]; 14 Corpus Juris, p. 492.)

It follows that the court erred in its findings and the judgment must be reversed in order that proper findings may be entered. And the judgment should not carry costs in favor of the defendant. Each party should be left to pay his own costs.

The judgment is reversed.

Waste, J., Lennon, J., Richards, J., *pro tem.,* and Myers, J., *pro tem.,* concurred.

Rehearing denied.

All the Justices present concurred.

Richards, J., *pro tem.,* and Myers, J., *pro tem.,* were acting.