[Civ. No. 6400. First Appellate District, Division Two.—October 29, 1928.]

K. H. LIST, Respondent, v. REPUBLIC BOND & MORTGAGE CO. (a Corporation), Appellant.

Treat, Bush & Ogden for Appellant.

Louis Oneal and Maurice J. Rankin for Respondent.

BUCK (G. F.), P. J., *pro tem.*—Action by plaintiff, a licensed broker's agent, to recover from defendant corporation the sum of $16,000 claimed as commissions due plaintiff for services rendered defendant in sale of some of defendant's capital stock.

The trial was by the court without a jury and the court found that "within two years last past plaintiff performed and rendered services for defendant at the instance and request of defendant, which services were and are of the aggregate and reasonable value of $2,250, no part of which has been paid." Judgment accordingly was rendered for plaintiff and defendant appealed.

Defendant was incorporated under the laws of the state of Delaware, with an authorized capital stock of $5,000,000, for the "particular purpose of engaging in the brokerage business, handling bond and first mortgage issues, particularly operating at Santa Barbara and vicinity." Upon application to the state corporation department of the state of California, defendant, for the purpose of acquiring a working capital, was granted permission to sell and issue 25,000 shares of its preferred and 25,000 shares of its common stock in units of one of preferred and one of common, at and for the price of $125 per unit, "cash, lawful money of the United States," for the foregoing purposes "or in exchange for 40% in cash and the promissory note or notes of the purchaser payable on or before one year." For the purpose of facilitating these sales in 1924, one Mr. D. Binkhorst was appointed fiscal agent with power to sell stock and appoint agents for that purpose and receive as his compensation a commission of twenty per cent on the sales. Later Mr. Binkhorst was elected president of the company and Dr. J. Underwood Hall was appointed manag-

ing director, with offices in San Francisco. In January of 1925 the plaintiff was appointed to act as a sales broker for the company, and upon proper application was granted a license by the state corporation commission to act as such sales broker. In February of 1925, as the result of the services of the plaintiff as sales broker, Mr. Thomas H. B. Varney was induced to buy $5,000 worth of defendant's stock, and plaintiff received from the defendant the sum of $500, being the amount of his agreed commission for effecting such sale. Thereafter the plaintiff, with the knowledge and at the request of defendant, continued to solicit Varney to purchase more stock, and in the latter part of March plaintiff was informed that Varney had purchased $160,000 worth of defendant's stock and that the sale had been consummated at the offices of the company through the activities of the president, Binkhorst, and the managing director, Dr. Hall. Whereupon plaintiff made demand both upon Binkhorst and Dr. Hall for the amount of commissions which the company agreed to pay him in the event of his procuring purchasers of the company's stock. Plaintiff, however, failed to receive any satisfactory answer from either of these parties, and on May 11, 1925, commenced this action.

The evidence given by plaintiff shows that he had a clear understanding with the company that he was to receive ten per cent upon sales of stock effected by him, and his testimony further shows that it was he and he alone who first interested Varney in the purchase of stock and that "but for" the plaintiff Varney would never have become interested in the company. And the testimony further shows that up to the latter part of March plaintiff was constant in his efforts to sell to Varney stock in addition to the $5,000 worth that he had already sold him. Furthermore, that plaintiff was, without doubt, acting in good faith in believing that Binkhorst and Dr. Hall had on behalf of the company, on or about March 19, 1925, effected a sale to Varney of $160,000 worth of stock, upon which he, the plaintiff, would be entitled to receive his commission of ten per cent. But the evidence further shows that, as a matter of fact, no lawful sale of stock was at that time made. At the trial of the case it was conclusively shown that the terms

upon which the sale was attempted to be made by Binkhorst and Dr. Hall were in violation of the penal statute of the state, enacted for the protection of corporations and the investing public. As already noted, the permit under which the corporation was permitted to sell its stock explicitly provided that the sales should be for cash or for forty per cent in cash and the balance in notes, secured by the purchased stock, and the permit further provided that the total commissions and all other expenses incurred in connection with the sale of shares ''shall not exceed twenty per cent of the amount of the selling price of each unit, provided that no part thereof shall be paid until forty per cent of the purchase price shall have been received by the company.'' And section 14 of the Corporate Securities Act of the state of California, as amended in 1925 (Stats. 1925, chap. 447, p. 970), provides as follows:

''Every officer, agent, or employee of any company, and every other person, who knowingly authorizes, directs or aids in the issue or sale of, or issues or executes, or sells, or causes or assists in causing to be issued, executed or sold, any security, in nonconformity with a permit of the commissioner then in effect authorizing such issue, or contrary to the provisions of this act, . . . or who, directly or indirectly, knowingly applies, or causes or assists in causing to be applied, the proceeds, or any part thereof, from the sale of any security to any purpose contrary to the provisions of the permit authorizing the issue of such security, . . . in violation of any of the provisions of this act, sells or offers the same for sale, . . . or who, in any other respect, wilfully violates or fails, omits, or neglects to obey, observe, or comply with any order, permit, decision, demand, or requirement, or any part or provision thereof, of the commissioner under the provisions of this act, . . . is guilty of a public offense and shall be punished by imprisonment in the state prison not exceeding five years, or in a county jail not exceeding two years or by a fine not exceeding $5000 or by both such fine and imprisonment.''

The evidence at the trial further shows that on or about March 19, 1925, there was issued and transferred to Varney 1,280 units of stock of the value of $160,000; but that the only consideration therefor received by the com-

pany, or intended at the time of the sale to be received by the company, was the sum of $10,000 in cash, and three pieces of real estate lying respectively in the counties of Santa Clara, Marin and San Francisco, of the estimated value of $142,500 and the verbal promise on the part of Varney to pay $7,500. The transfer of the real estate was evidenced by deeds duly executed and recorded, and the cash was represented by the conversion of a loan in that amount to the company by Varney, which was applied on the purchase price. As stated by the trial judge at the trial: "The note for $10,000 was part payment on the $160,000 stock purchase, the balance by the original agreement was in real estate. That is all there is to that . . . the court is not going to hold that the stock was paid for in cash; I cannot do that; it is not the fact." It is true that for reasons best known to themselves the subscription for the stock signed by Varney and the officers of the company, Mr. Binkhorst and Dr. Hall, did recite that the consideration for the stock was cash. But, as already noted, the evidence showed that no cash, except the sum of $10,000, was paid or intended at the time to be paid by Varney for the stock. Consequently the plaintiff cannot be permitted to collect a commission for procuring a purchaser to purchase upon terms which are, by statute, denounced as the commission of a felony. As already indicated, the plaintiff was not aware of this irregular sale at the time he brought his suit. In fact, he had no reason to believe that the officers of the company were attempting to sell the stock of the company in violation of the permit issued by the state corporation commission. This is the more evident because shortly before taking up his duties as sales agent of the company he was assured by the managing director of the company in his serial letter: "To all members of sales staff: The most valuable thing that we possess is our good name. We are entrusting it to your care in the belief that you will guard it well. It would be easy to destroy it. We do not believe, however, that you in whom we place full confidence will be guilty of compromising that name in the least. It is our chief asset, and without it we would be poor indeed . . . in other words,

we do not want and will not have anything but clean business.''

Notwithstanding, then, the good faith of the plaintiff in demanding his share of the commissions on what he believed was a legitimate sale, he cannot be permitted to recover for any services he may have rendered in even unconsciously aiding the officers of the company in consummating an unlawful or void sale, denounced by the statute as the commission of a felony. (*Atwater* v. *A. G. Edwards etc. Co.*, 147 Mo. App. 436 [126 S. W. 823, 826]; *Volker* v. *Fisk*, 75 N. J. Eq. 497 [72 Atl. 1011]; *Cone* v. *Keil*, 18 Cal. App. 675, 679 [124 Pac. 548]; *Domenigoni* v. *Imperial Live Stock etc. Co.*, 189 Cal. 467 [209 Pac. 36]; *Smith* v. *Bach*, 183 Cal. 259 [191 Pac. 14].)

But it is the contention of the respondent that the judgment of the court awarding to the plaintiff the sum of $2,250 should be sustained by reason of certain transactions had by Varney with the company after the commencement of the action, which resulted in July of 1925 in Varney subscribing to stock of the company to the extent of $45,000. It is respondent's contention that the procuring causes of the foregoing subscription were the services rendered by the plaintiff in soliciting Varney up to the time of the foregoing transaction of March 19th. And in this behalf learned counsel contend that the services of plaintiff were ''the cause originating a series of events that without break in their continuity result in the accomplishment of the prime object of the employment of the agent.'' (4 Cal. Jur. 584.) But as regards this contention the testimony clearly shows that there was a potent and sufficient cause entirely independent of the activities of plaintiff which of itself and without any assistance from plaintiff was the proximate cause of Varney's purchase of the $45,000 of stock in July, 1925. For the evidence shows that shortly after the illegal and felonious transaction of March 19th, Varney became advised of the fact that he had no legal title to the 1,280 shares of stock. And this was not unwarranted advice, for section 12 of the Corporate Securities Act (Stats. 1917, chap. 532, p. 679) provides that ''every security issued by any company, without a permit of the commissioner authorizing the same then in effect, shall be void, and every security issued

by any company, with the authorization of the commissioner but not conforming in its provisions to the provisions, if any, which it is required by the permit of the commissioner to contain, shall be void.''

And, as already noted, Varney had divested himself of the legal title to his real estate of the presumable value of $142,500 and $10,000 in cash as the result of transactions in which it might be held he himself was *in pari delicto*. So that, had he brought suit for the return of his property after his stock certificate had been canceled he would be in danger of being left where he had placed himself by his participation in an unlawful transaction. (*Domenigoni* v. *Imperial Live Stock etc. Co., supra; Tatterson* v. *Kehrlein,* 88 Cal. App. 34 [263 Pac. 285]; *Parrish* v. *American Ry. etc. Corp.,* 83 Cal. App. 298 [256 Pac. 590].)

The attitude of Mr. Varney is shown by his testimony as follows: ''What started the investigation or the inquiry in regard to the irregularity of this deal? A. When I was at the directors' meetings or at the stockholders' meetings, or either, some very promiscuous talks were made there at the meetings which did not meet with my ideas. I became doubtful as to the standing of the company. I went to my attorney with the matter. Q. After you have made, after the stock had been issued to you, you became rather dissatisfied with it? A. More than rather. Q. In particular, with Mr. Binkhorst? A. Yes. Q. It was because of that dissatisfaction with Mr. Binkhorst that you rescinded or changed this agreement? A. It was because of the way the company was run. Q. You then went to your lawyers to see some way for you to get out of it? A. I went to my lawyer to see, to question him as to the transactions, and learn from him which was illegal, and naturally I wanted to make it legal, if I could. Q. You used that method, you used the claimed illegality of the sale or transaction to force a compromise? A. I act with my attorney, I don't know what to answer to that question, hardly. . . . Q. When you say you were dissatisfied, why were you dissatisfied; when you say you were dissatisfied by the way in which the company was run, why were you dissatisfied? A. From what I could see, the company was run for the sake of making commis-

sions on the sale of stock, it was not run to build up the business.''

As a result of negotiations between the attorneys for Varney and the attorneys for the company, the company accepted the proposal by way of compromise from Varney, that ''with reference to the controversy as to the purchase of stock by me'' the Republic Bond & Mortgage Company should cancel such subscription and should execute deeds to Varney of the three parcels of real estate deeded by Varney to the company, and that the company should issue to Varney a certificate for 360 units of stock in the company, and that Varney should pay to the company in cash the sum of $35,000 and that the company should retain the $10,000 formerly paid by Varney to the company.

Further testifying in regard to the transaction, Varney states: ''Q. Was the real estate to which I have referred, the Marin County property, the San Francisco property and the Santa Clara County property, ever returned to you? A. Yes. Q. Under what circumstances? A. It was returned to me because of the sale of their stock to me for cash and the property was considered illegal. My attorneys told me that it was illegal, the sale. And the Republic Bond & Mortgage Company's attorneys also told me the sale was illegal, and another attorney told me the sale was illegal, and I wanted to get the matter straightened out. Q. Did you go to Los Angeles for that purpose? A. Yes. Q. There did you have conferences with the officers of the Republic Bond & Mortgage Company? A. Yes. Q. As a result of the conferences, was there any agreement reached? A. Yes. Q. With reference to the transfer of your property, or the retransfer back to you of your property? A. Yes. Q. Was that expressed in writing? A. Yes.''

Aside from the fact that this transaction was consummated more than two months after the commencement of the action, and at a time when Varney, so far from being a willing purchaser of the stock, was entirely distrustful of and dissatisfied with the company, and had apparently lost any enthusiasm for it that may have been engendered through his conversations with the plaintiff, and when his sole apparent motive was to recover the property which he had deeded without consideration to the company, it is ap-

parent that there is no evidence sufficient to sustain any presumed finding that the plaintiff, by any unbroken chain of circumstances, was the procuring cause of the acquisition by Varney in July, 1925, of the $45,000 of stock. Furthermore, there is no supplemental pleading upon which to base any such finding.

Judgment will therefore be reversed.

Sturtevant, J., and Nourse, J., concurred.