[Civ. No. 6040. First Appellate District, Division One.—December 28, 1927.]

GEORGE W. TATTERSON et al., Respondents, v. OLIVER KEHRLEIN et al., Appellants.

Jesse Robinson and John G. Robertson· for Appellants.

Crosby, Naus & Crosby and Daniel Rygel for Respondents.

CAMPBELL, J., *pro tem.*—On November 4, 1916, "The Franklin Amusement Corporation" was incorporated under the laws of the state of California, and two years later certain issued stock was purchased by appellants. On September 28, 1923, the agreement, which is the foundation of this litigation, was entered into between appellants and respondents.

The agreement is very lengthy and need not be set out *in haec verba.* We summarize it, setting forth merely such portions as are necessary to an· understanding of the questions involved in this appeal:

Preamble: "This memorandum of agreement made and entered into on the 28th day of September, 1923, by and between Oliver Kehrlein, Emil Kehrlein and Emil Kehrlein, Jr., hereinafter known and referred to as parties of the first part, and George W. Tatterson, J. M. Maurer and L. B. Gross, hereinafter known and referred to as parties of the second part, witnesseth: that whereas the parties of the first part are the owners of all of the issued and outstanding stock of the Franklin Amusement Corporation, a California Corporation, and whereas, said parties of the first part are desirous of selling to parties of the second part said stock in said corporation under the terms and conditions hereinafter set forth and the parties of the second part are desirous of buying said stock upon said conditions"; article I: The parties agree respectively to sell and buy 2800 shares, "being all of the issued stock of said corporation"; price $90,000, payable in installments as follows: $250 down; $450 on November 14, 1923; $700 on December 14, 1923, and $700

on the fourteenth day of each and every month thereafter until the whole sum of $90,000 shall have been paid. There shall be deposited and paid on or before October 14, 1923, the sum of $10,000 as security for the payment of the sums to be paid monthly and of the performance of the terms and conditions of the agreement. Article II: "All of the stock of the Franklin Amusement Corporation mentioned in paragraph I herein and in the preamble hereto, together with a certificate or certificates issued to the parties of the second part jointly covering the treasury stock of the Franklin Amusement Corporation now and hereafter issued, shall be deposited in the Trust Department of the Central National Bank of Oakland under written escrow instructions hereto attached and made a part of this agreement," etc. Article III provides for contingency of default in payment of installments. Article IV provides that the corporation at the time of the transfer of the stock shall be free and clear of all debts and liabilities other than those arising under the lease now covering the property and provides further remedies in case of default by the buyers. Article V provides that on or before October 14, 1923, the corporation shall execute a sublease of the stores in the theater building to parties of the first part at a yearly rental of $1. Article VI: "It is mutually agreed by and between the parties hereto that the parties of the first part will upon the due execution of this agreement and the payment of the sum of $10,000.00 herein mentioned and the opening of the escrow with the Central National Bank of Oakland as per the terms of Exhibit A attached hereto, deliver to the parties of the second part five shares of the capital common stock of the said Franklin Amusement Corporation to qualify as directors in the said Franklin Amusement Corporation. The said five shares shall not become a part of the escrow under Exhibit A herein, but shall be in absolute ownership in parties of the second part herein," etc.

Exhibit "A" attached to the agreement is entitled "Escrow Instructions" and is directed to Central Bank of Oakland, trust department, and is signed by all the parties to the agreement and reads in part, "The undersigned herewith hand you in escrow certificates Nos. 30, 31, 29 and 37, the same constituting all but three shares of the capital stock

of the Franklin Amusement Corporation, a California corporation, the said stock being endorsed to Oliver Kehrlein, Emil Kehrlein and Emil Kehrlein, Jr. This stock you are to hold subject to the following instruction, to wit: If there shall be paid to you to the order of Oliver Kehrlein, Emil Kehrlein and Emil Kehrlein, Jr., the sum of $45,000 on the 14th day of November, 1923, $700.00 on the 14th day of December, 1923, and $700.00 on the 14th day of each and every month thereafter until the entire sum of $79,950.00 shall have been paid, then and in that event all of said certificates of stock hereinabove enumerated shall be delivered by you to the order of George W. Tatterson, J. M. Maurer and L. B. Gross, administrators, successors or assigns.'' Then follow provisions in case of default in payments.

On a strip of paper which was glued to the margin of article VI of the agreement is the following paragraph: ''It is further agreed that for the purpose of conducting the affairs of the Franklin Amusement Corporation that the capital stock now issued and placed in escrow as a pledge with the Central National Bank of Oakland shall be and is owned by the parties of the second part, and may be voted by them for all purposes in conformity with this agreement and not contrary thereto.''

The agreement we have summarized is the basis of three suits: this one in which George W. Tatterson, J. M. Maurer, and L. B. Gross are plaintiffs and Oliver Kehrlein, Emil Kehrlein, and Emil Kehrlein, Jr., are defendants, in which plaintiffs allege fraud on the part of defendants and seek to recover $31,030 damages and in which judgment was entered in favor of plaintiffs in the sum of $12,071.86; the second suit in which Oliver Kehrlein is plaintiff and George W. Tatterson is defendant, wherein plaintiff seeks to recover the sum of $1,500 on a promissory note executed by George W. Tatterson, the defendant in the action, and in which judgment was entered for defendant, and the third suit wherein Oliver Kehrlein, Emil Kehrlein, and Emil Kehrlein, Jr., are plaintiffs and the Franklin Amusement Corporation (a corporation), George W. Tatterson, J. M. Maurer, and L. B. Gross are defendants, in which plaintiffs seek damages for breach of covenant to keep the rental paid, with

consequent damages arising from loss of rent from subtenants, in which judgment was entered for defendants.

This appeal is prosecuted by appellants herein, who are also appellants in the other two actions mentioned. The three actions were consolidated in the trial court, and the appeals are presented upon one set of briefs. Should the case under consideration be affirmed, in view of the fact that the two other actions are based upon the same transaction, a similar order must be entered in each of the other two cases.

Appellants urge the following points on this appeal: 1. Insufficient evidence to support certain findings; 2. Certain findings are outside the issues of the case; 3. The judgment is erroneous in point of law.

Under the heading "Insufficient evidence to support certain findings" appellants complain of the following facts found by the court which they assert there is insufficient evidence to support: Finding I: "On February 29, 1924, these defendants became and ever since have been indebted to these plaintiffs George W. Tatterson and J. M. Maurer in the sum of $10,907.50 for money had and received by these defendants to and for the use and benefit of said plaintiffs, no part of which sum, nor any interest thereon, has been paid"; finding II: That "the said 2200 shares were issued, as hereinafter set forth, without any permit or certificate or authority from said commissioner and/or said department, and in violation of the Corporation Securities Act"; finding IV: "That continuously and for several weeks to and including the 28th day of September, 1923, the plaintiff Gross was, without the knowledge of his co-plaintiffs Tatterson and Maurer, secretly the agent of, and in the employ of, the defendants for the purpose of selling the capital stock and/or the assets of said Franklin Amusement Corporation to the said Tatterson and Maurer, and the efforts and negotiations and representations of the said Gross were the procuring cause of the execution by said Tatterson and Maurer, and each of them, of the contract hereafter referred to (contract hereinabove summarized); finding V: "The plaintiffs Tatterson and Maurer relied upon the judgment and discretion of their co-plaintiff Gross in fixing the terms of said contract, and relied upon the said Gross to

obtain the most favorable terms possible in buying said stock from the defendants; and the price of $90,000.00 together with the amounts and times of payment of installments thereof, were first fixed and suggested by Gross to the defendants, then assented to by the latter, whereupon said Gross represented that price to said Tatterson and Maurer, as and because thereof the plaintiffs Tatterson and Maurer believed it to be, the lowest price at which defendants would sell to the plaintiffs''; and finally finding VI: ''And prior to the time of making said contract, the defendants, with intent to deceive and defraud the plaintiffs Tatterson and Maurer, falsely and fraudulently represented to them and each of them that the theatre business of said corporation had always been profitable and paid well. Neither of said plaintiffs knew that said representation was false and untrue, and the said plaintiffs, believing in and relying on the truth of said representations, executed said contract.''

Appellants concede the following facts found in finding II: ''Franklin Amusement Corporation was incorporated under the laws of the State of California on November 4, 1916, and not earlier, with an authorized capital stock of $50,000.00, divided into 5000 shares of the par value of $10.00 each; and on November 15, 1916, received from the Commissioner of Corporations of California a certificate or permit authorizing it to sell and issue 2800 shares of said stock, and no more, said certificate or permit being the only certificate or permit of authority ever received by said corporation from, or issued or given to it by the Commissioner of Corporations and/or the State Corporation Department of California. The said corporation issued the said 2800 shares in November, 1916, and the remaining 2200 shares of the capital stock remained in the treasury of said corporation unissued, until September 28, 1923,''—but do not concede the remainder of the finding—''when the said 2200 shares were issued, as hereinafter set forth, without any permit or certificate of authority from said commissioner and/or said department, and in violation of the Corporate Securities Act.''

Under the escrow instructions addressed and delivered to Central National Bank of Oakland four certificates of stock were deposited with the bank, being certificates Nos.

30, 31, 29, and 37. The old certificates for 2,800 shares of the issued and outstanding stock were transferred into three new certificates as follows: Certificate No. 29 for 933⅓ shares to George W. Tatterson; certificate No. 30 for 933⅓ shares to J. M. Maurer, and certificate No. 31 for 933⅓ shares to L. B. Gross.

The 2,200 shares of treasury stock were issued simultaneously to respondents as follows: Five shares as qualifying shares and the remaining 2,195 shares were issued under certificate No. 37 jointly in the names of George W. Tatterson, L. B. Gross, and J. M. Maurer. The certificates, thus aggregating 4,995 shares out of the total capitalization of 5,000 shares, were indorsed in blank and went into escrow, and as thus indorsed were held by Central National Bank of Oakland, pursuant to the escrow instructions.

As between themselves Tatterson and Maurer arranged that each should pay half of the payment of $10,000 required to be made on or before October 14, 1923. Maurer paid his $5,000. Tatterson paid $3,000 of his half on October 8, 1923, and $500 on October 17, 1923, leaving a balance of $1,500, for which the sellers accepted his note, which note is the basis of the suit brought by Oliver Kehrlein against George W. Tatterson hereinbefore mentioned. The $10,000 thus being taken care of, the buyers were let into possession of the property of the corporation on October 14, 1923, and operated the theater at a loss for twenty weeks, when they surrendered the property to the sellers and served the following notice of rescission, which notice bears date February 29, 1924, and is signed by respondents, George W. Tatterson, J. M. Maurer, and L. B. Gross, and addressed to appellants Oliver Kehrlein, Emil Kehrlein, and Emil Kehrlein, Jr.:

"Take Notice. That that certain agreement made and entered into by and between you and the undersigned on the 20th day of September, 1923, for the mutual purchase and sale of all of the stock of the Franklin Amusement Company, together with the personal property and lease owned by said company and the business of the Franklin Theatre, is hereby rescinded for and upon the grounds of the fraud and misrepresentations practiced upon the undersigned by you, and further performance of said agreement is refused and the

lease to said building and property, together with the modification thereof, the possession thereof and of the personal property therein, together with five shares of stock of said corporation, in the possession of the undersigned, the stock certificate book, the stock ledger, the stock journal, the by-laws of said corporation and any and all other things of value received from you by the undersigned are hereby tendered to you and offer of the delivery thereof is made to you and consent is hereby given you to withdraw from the escrow of the Central National Bank of Oakland all of the stock of said Franklin Amusement Corporation on deposit in said bank.

"And demand is hereby made upon you for the re-payment to the undersigned of the sum of $12,000.00 paid upon said contract by us, and the further sum of $5,555.94 paid under the terms of said lease by the undersigned, and the further sum of $13,074.12 losses caused the undersigned by the said fraudulent representations made by you in inducing the undersigned to enter into said agreement, to wit: That said business was a paying business, paying large profits; that said corporation was free of debts and all of the other representations made by you to the undersigned for the purpose of inducing the undersigned to enter into said agreement, all of which were false and untrue, and for which reasons the said agreement is hereby rescinded."

Thereafter, on March 1, 1924, the Kehrleins resumed possession of the corporation's property and operated the theater until April 22, 1924, when they abandoned it, the lease being then forfeited by them to the landlord in unlawful detainer, and the corporation went into involuntary bankruptcy.

The evidence shows that appellants are indebted to respondents George W. Tatterson and J. M. Maurer in the sum of $10,907.50, with interest from February 29, 1924, which in equity and good conscience ought to be paid, because at approximately that date the parties mutually rescinded the agreement of September 28, 1923. The respondents rescinded the agreement by the notice of rescission and tendering to appellants the five shares of qualifying stock, the personal property in their possession, the stock certificate book, the stock ledger, the stock journal, the by-laws of the

corporation and every other thing of value, together with consent that appellants might withdraw from escrow all of the stock of the Franklin Amusement Corporation on deposit in Central National Bank, and as the theater had been run at a loss there were no profits to return or offer to return, and as stated, appellants resumed possession of the property of the corporation on March 1, 1924.

Appellant Oliver Kehrlein testified that he was the manager of the Franklin Amusement Corporation up to the time of the sale to Tatterson, Maurer, and Gross, approximately five years; that the theater was taken back and he assumed the management of it about February 29, 1924.

The witness Carl H. Nieper testified: ''I had a conversation with Mr. Oliver Kehrlein regarding the Franklin Theatre about the time he took it over from Tatterson, Maurer and Gross. It was not very long after March 1, 1924. Nobody present but Mr. Kehrlein and myself in his office in the Tribune Building. I approached Mr. Kehrlein regarding the sale of the lease of the Franklin Theatre, and I asked Mr. Kehrlein for a price. At that time Mr. Kehrlein quoted me a price of $30,000.00, but I said that I had approached with the idea of giving $25,000.00. Those figures at that time did not seem to interest Mr. Kehrlein, because he thought he ought to get more than $25,000.00. I was then in the real estate business, a broker. I knew that the landlord was Williams, and there was a lease from him to the Franklin Amusement Corporation, and I was after that lease. Afterwards I came back—quite regularly afterwards—because I was interested in getting that lease, and I kept on. I saw Mr. Kehrlein a half dozen times or so. In the two months following the time in which he took the theatre over, I saw him sometimes twice a day. I know I made a call twice a day possibly the first week, and every other day after that, because I was very anxious at that time to get hold of the lease. I came back again and asked him if he would not take $25,000.00, and he asked me who my people were. I did not tell him who they were because I thought it was my personal business, and he said the reason he asked me was that these people, whoever they were, should be expert show people, in other words, they should know the business in order to run the theatre, because the

people who were handling it knew nothing about it, and didn't make any money for the reason they didn't know their business. I said my people qualified, and then near the close of the meeting he referred to Mr. Jesse Robinson, to confirm the price that he quoted me. Mr. Kehrlein quoted me a price. He wanted $30,000.00, and I offered him $25,000.00, and he says: 'You take it up with my attorney, Mr. Jesse Robinson.' I called on Mr. Robinson personally. Nobody present but Mr. Robinson and myself. Mr. Robinson came out of his office and talked to me in the ante room, and he asked me what I wanted. I told him, and he said: 'Make a price.' He didn't make any price. He said: 'Get a deposit and bring it in, and we will take it up.' Later Mr. Kehrlein called me up. He said if my party was still interested to get busy, he could not let that lease go, and I went back and saw Mr. Kehrlein and talked it over with him, and asked him if he could give me thirty days I might be able to put it over. He said, no, he wanted to give it up. He said, there is a time to give it up, and it is now, but he would give me a little time to go and see my man. Later, after the lease was up, I met Oliver on the street a couple of times, and he said he was sorry he did not take me up on my $25,000.00. Kehrlein did not explain to me in any of those conversations that he was running the theatre for the account of Tatterson, Maurer and Gross. Mr. Robinson said for me to bring in a deposit, and that he would take it up with his client, but nothing was ever mentioned regarding Mr. Tatterson or Mr. Maurer. Mr. Robinson said something about some trouble that Mr. Kehrlein was having, but no names were mentioned. I am positive that Mr. Robinson did not say that Mr. Kehrlein was not in any legal position to make any agreement.''

This evidence is sufficient to support finding XII: ''Subsequently to March 1, 1924, these defendants accepted and acquiesced in said rescission by attempting to sell the property of said theatre as their own.'' They assumed possession of all of the property and were armed with a written authorization contained in the notice of rescission to withdraw all of the stock from escrow, which stock was properly indorsed by respondents—being indorsed in blank and appellants could at their pleasure have the shares of stock

issued to them by the corporation and make a transfer of the stock to the purchaser.

If this finding is supported by sufficient evidence, and we think it is, even assuming the findings complained of to be erroneous—which, however, we do not concede—it would in no way affect the judgment or be ground for reversal, for the fact that a finding is not sustained by the evidence is immaterial, where the remaining findings are sustained and are sufficient to support the judgment. As was said in *Moore* v. *Copp*, 119 Cal. 429, 436 [51 Pac. 630] : "It is not necessary to consider whether objections to these findings are well taken, for, however erroneous, the judgment cannot be set aside inasmuch as it may rest upon finding F''—here finding XII (see, also, *Ehat* v. *Scheidt*, 17 Cal. App. 430, 438 [120 Pac. 49] ; *Lovell* v. *Frost*, 44 Cal. 471, 475). Therefore, if the contract was rescinded, the note given by Tatterson to Kehrlein must be returned. "Upon a mutual rescission of a contract, the law requires each party to restore whatever he has received under it" (*Dugan* v. *Phillips*, 77 Cal. App. 268 [246 Pac. 566, 569]; *Green* v. *Darling*, 73 Cal. App. 700 [239 Pac. 70]). "If the minds of the parties met on the proposition that they would rescind, it was not necessary that the defendant stipulate to return to the plaintiff the money which he had received, for the law requires him to do this as a consequence of having agreed that the contract be abrogated" (*Green* v. *Darling*, *supra*).

In the present case the corporation owned the theater, and only the corporation could sell it. At the time the witness Nieper testified that appellants offered to sell the theater for $30,000 appellants could act for the corporation only through acceptance of the indorsed stock certificates restored to appellants when they were served with the notice of rescission. The notice of rescission was an offer of rescission; Nieper's testimony supports a finding of acceptance of that offer, thus creating a mutual rescission. While the offer of rescission on the one side must be accepted on the other, such offer and acceptance are governed by the same rules as govern the inception of contracts generally. Assumption of ownership of the subject matter of a sale, such as selling it, is a ratification of the rescission of the contract (*Sauble*

v. *Gary S. C. Agency,* 56 Cal. App. 606, 611 [206 Pac. 141]). A rescission by consent may be implied from the acts of the parties (*Hogan* v. *Anthony,* 40 Cal. App. 679, 684 [182 Pac. 52]; *Tompkins* v. *Davidow,* 27 Cal. App. 327, 335 [149 Pac. 788]).

While discussion of the remaining objections urged by appellants is not necessary to an affirmance of the judgment, it may be said that the finding that the ''2200 shares were issued as herein set forth without any permit or certificate or authority from said commissioner or said department and in violation of the Corporate Securities Act'' is supported by the evidence. Five of these shares were issued and delivered to respondents as qualifying shares, and the remaining 2,195 shares were issued and deposited with the bank to be delivered to respondents upon making certain payments. Respondents contend that while the stock under the escrow instructions given to the bank was evidently intended originally as an escrow, the last-minute change in the contract at the foot of article VI ''that the capital stock now issued and placed in escrow as a pledge with the Central National Bank of Oakland *shall be and is owned by the parties of the second part,* and may be voted by them for all purposes in conformity with this agreement and not contrary thereto'' changed the character of the stock from an escrow to a pledge as security for the payments due under the contract. ■ While we think this is true, it would make no difference, as the issuing of the stock and placing it in escrow is as much a violation of the Corporate Securities Act as though the stock had been sold outright.

The Corporate Securities Act, chapter 532, Statutes of 1917, as amended by chapter 148, Statutes of 1919, chapters 597 and 658, Statutes of 1921, and chapter 50, Statutes of 1923, defines in section 2, subdivision 7, the term ''sale'' as including ''issue.'' Section 3 prohibits ''sale'' (which includes ''issue'') without securing a permit from the commissioner of corporations; section 12 makes security issued without a permit void; section 13 makes the ''issuing'' corporation guilty of a public offense, and section 14 makes the officers, agents, and employees of the corporation guilty of a public offense.

The contract of September 28, 1923, being prohibited and the making thereof subject to a penalty, the contract is illegal and void; the penalty implies a prohibition (*Levinson* v. *Boas*, 150 Cal. 185 [11 Ann. Cas. 661, 12 L. R. A. (N. S.) 575, 88 Pac. 825]; *Smith* v. *Bach*, 183 Cal. 259 [191 Pac. 14]; *Reno* v. *American Ice Machine Co.*, 72 Cal. App. 409 [237 Pac. 784]; *Napa Valley E. Co.* v. *Calistoga E. Co.*, 38 Cal. App. 477 [176 Pac. 699]), and respondents, having paid money in consideration of an executory contract which is illegal, were privileged to repudiate the agreement and reclaim the money (*Smith* v. *Bach, supra*). In *Smith* v. *Bach*, at pages 262, 263, the court uses this language: "Here it is manifest from a reading of the entire act that the statute in question was passed for the protection of the public and not as a revenue measure. . . . In such a case a contract made in violation of its terms should be held to be void. . . . The general rule controlling in cases of this character is that where a statute prohibits or attaches a penalty to the doing of an act, the act is void, and this notwithstanding that the statute does not expressly pronounce it so, and it is immaterial whether the thing forbidden is *malum in se* or merely *malum prohibitum*. A statute of this character prohibiting the making of contracts, except in a certain manner, *ipso facto* makes them void if made in any other way. . . . The imposition by statute of a penalty implies a prohibition of the act to which the penalty is attached, and a contract founded upon such act is void."

The Corporate Securities Act was passed for the protection of the public and "every case from every court recognizes that when a statute has been made for the protection of the public, a contract in violation of its provisions is void" (*Payne* v. *DeVaughn*, 77 Cal. App. 399, 403 [246 Pac. 1069]). As it was illegal for the corporation to issue the 2,200 shares of treasury stock without a permit from the commissioner of corporations, it was likewise illegal for the Kehrleins, as agents, officers, or representatives of the corporation, to join with it, or aid or abet or assist it in committing the illegal act, or to commit the act for the corporation (*King* v. *Johnson*, 30 Cal. App. 63 [157 Pac. 531]).

Appellants contend that respondents were buying the

theater and not the stock of the Franklin Amusement Corporation except as a means to that end, and that if respondents received what they bargained for and wanted, they should not be permitted to contend that what they were buying was stock which meant nothing and represented nothing. What respondents sought was the property of the corporation which was represented by the stock, and it was this stock they were buying so that they could control the corporation, and which was so expressed in the contract. To hold otherwise would require the court to change or modify the express terms of the agreement of the parties. The defenses of estoppel, waiver, and ratification are not available in the case of an illegal contract. "This is one of the distinctions between void and voidable contracts. The doctrines of estoppel by conduct and ratification have no application to a contract which is void because it violates an express mandate of the law or the dictates of public policy. Such a contract has no legal existence for any purpose and neither action nor inaction of a party to it can validate it and no conduct of a party to it can be invoked as estoppel against asserting its invalidity." (*Reno* v. *American Ice Machine Co. supra;* see, also, *Colby* v. *Title Ins. Co.*, 160 Cal. 632 [Ann. Cas. 1913A, 515, 35 L. R. A. (N. S.) 813, 117 Pac. 913]; *MacRae* v. *Heath*, 60 Cal. App. 64, 72 [212 Pac. 228]; *Reilly* v. *Clyne*, 27 Ariz. 432 [40 A. L. R. 1005, 234 Pac. 35, 39]).

The penalties prescribed by the Corporate Securities Act being all laid on the seller and none on the buyer, and the statute being for the benefit and protection of buyers, the parties are not *in pari delicto,* and the buyer may have judgment for the money paid out by him under the illegal contract, and may have the contract, the stock certificates and promissory note given in payment of such stock canceled (*Reilly* v. *Clyne*, 27 Ariz. 432 [40 A. L. R. 1005, 234 Pac. 35]; *Karamanou* v. *Green Co.*, 80 N. H. 420 [124 Atl. 373]; *Vercellini* v. *U. S. I. Realty Co.*, 158 Minn. 72 [196 N. W. 672]; *Edwards* v. *Ioor*, 205 Mich. 617 [15 A. L. R. 256, 172 N. W. 620]; *Landwehr* v. *Lingerfelder* (Mo. App.), [249 S.W. 723]; *Reno* v. *American Ice Machine Co., supra*). The foundation of the right of the plaintiff to recover in these cases, although a party to the illegal contract, is the

rule of the common law declared by Lord Mansfield in *Browning* v. *Morris*, 2 Cowp. 790, 98 Eng. Reprint, 1364 (quoted from in the Arizona and New Hampshire cases, *supra*), as follows: "The rule is, *in pari delicto potior est conditio defendants.* . . . Where the contract is executed, and the money paid *in pari delicto,* this rule certainly holds . . . and the party who has paid it cannot recover it. For instance, in bribery, if a man pays a sum of money by way of a bribe, he can never recover it in an action, because both plaintiff and defendant are equally criminal. But where contracts or transactions are prohibited by positive statutes for the sake of protecting one set of men from another set of men—the one, from their situation and condition being liable to be oppressed or imposed upon by the other—there the parties are not *in pari delicto;* and, in furtherance of these statutes, the person injured, after the transaction is finished and completed, may bring his action and defeat the contract." In *Reilly* v. *Clyne, supra,* it is said: "The complaining party is especially protected by the law where the agreement is not illegal *per se* but is merely prohibited. . . . The purpose of the 'Blue Sky Law' is to protect the public against imposition. The defendant is one of the public for whose benefit the law was enacted," and in *Irwin* v. *Curie,* 171 N. Y. 409 [58 L. R. A. 830, 64 N. E. 161], the court says: "It is safe to assume that whenever the statute imposes a penalty upon one party, and none upon the other, they are not to be regarded as *par delictum,*" and in *Edwards* v. *Ioor, supra,* the court uses this language: "It is very material that the statute itself, by the distinction it makes, has marked the criminal, for the penalties are all on one side."

In contravention of the rule announced in the authorities quoted, appellants have cited us to *Domenigoni* v. *Imperial Live Stock Co.,* 189 Cal. 475 [209 Pac. 36], as holding that a buyer of stock sold in violation of the Blue Sky Law is *in pari delicto* with the seller. That case is not authority for such a broad rule, and the law therein stated is confined to the facts of that case and is therefore distinguishable from the present case. That it was not understood as laying down such a broad rule is apparent, for subsequent to the decision in the Domenigoni case, which was decided in 1922,

the supreme court in 1925 denied a petition for a transfer in *Reno* v. *American Ice Machine Co., supra*. In the Domenigoni case the record shows that the corporation was organized for the purpose of lending money upon the security of livestock as an instrument of mutual aid among stock men, and by selling 190,000 shares of its capital stock at $10 per share, as permitted by the corporation commissioner, a fund of approximately $1,900,000 would be created for lending purposes. Domenigoni's acquiring stock through the medium of his "myself" notes instead of cash was in the nature of a fraud upon the other purchasers of stock who paid cash. Domenigoni conspired with the corporation to do a wrong to the other buyers—the very class of persons the Blue Sky Law was designed to protect.

But even though respondents had been *in pari delicto*, as they withdrew from the illegal contract while it was still executory, they were in a position to reclaim the money paid (*Smith* v. *Bach, supra*), and further, even though the *locus poenitentiae* had gone, nevertheless the respondents having, as found by the court, been induced to contract through the fraud of appellants, they are not deemed *in pari delicto* (*Webb* v. *Fulchire*, 25 N. C. 458 [40 Am. Dec. 419]; Woodward on Quasi Contracts, sec. 141).

Appellants urge that the 2,200 shares of treasury stock had no value. Whether a covenant is of value or is valueless is to be determined by the appetite of the contracting parties (6 Eng. Rul. Cas. 19). "The slightest consideration is sufficient to support the most onerous obligation; the inadequacy, as has been well said, is for the parties to consider at the time of making the agreement, and not for the court when it is sought to be enforced. It is competent for the parties to make whatever contracts they please" (13 C. J. 365, and cases cited). Here the testimony of Tatterson, Maurer, and Gross is direct to the effect that if the treasury stock had not been included they would not have signed the contract with the Kehrleins, and appellant Oliver Kehrlein in his testimony admitted that the issuance of the treasury stock was indispensable to the signing of the contract.

There is no merit in appellants' contention that, although the issuance of the 2,200 shares of treasury stock might

be bad, yet the transfer of the 2,800 shares of outstanding stock was good, and that the bad can be severed from the good—that the contract is only partially illegal.

There is a distinction between partially *illegal* contracts and partially *unenforceable* contracts. This distinction is noted in *Nicholson* v. *Ellis,* 110 Md. 322 [132 Am. St. Rep. 445, 24 L. R. A. (N. S.) 942, 73 Atl. 17], in a case involving a covenant in restraint of trade. There the court says: "Contracts in undue restraint of trade are loosely spoken of as illegal contracts. It is more accurate to style them unenforceable contracts. . . . Even if it (the trade restraint covenant) be illegal as against public policy, it contains nothing contrary to good morals, and *nothing for which a legal penalty is incurred* (italics ours), and therefore it does not taint the whole agreement so as to render it void *in toto.* As was said by Chief Baron Pollock in *Green* v. *Price,* 13 Mees. & W. (Eng.) 695, 'it is not like a contract to do an illegal act. It is merely a covenant which the law will not enforce, but the party may perform if he chooses.' "

In this state it is the rule that if any part of the consideration of a contract is illegal, the contract is wholly void. In *Teachout* v. *Bogy,* 175 Cal. 481 [166 Pac. 319], the court uses this language: "If any part of a single consideration for one or more promises be illegal, or if there are several considerations for one promise, some of which are legal and others illegal, the promise is wholly void, as it is impossible to say which part or which one of the considerations induced the promise. Thus, if the consideration for a note or other promise to pay a certain sum of money be the sale of goods, some of which it is legal and some of which it is illegal to sell, the note or promise cannot be enforced (9 Cyc. 566; see, also, 1 Elliott on Contracts, sec. 248; *Moffatt* v. *Bulson,* 96 Cal. 112 [31 Am. St. Rep. 192, 30 Pac. 1022]; *Vulcan Powder .Co.* v. *Hercules Powder Co.,* 96 Cal. 510 [31 Am. St. Rep. 242, 31 Pac. 581]; *Humboldt Co.* v. *Stern,* 136 Cal. 63 [68 Pac. 324])." In the present case "every part of the consideration goes to the whole promise, and therefore, if any part of it is contrary to public policy, the whole promise fails" (*Hazelton* v. *Sheckells,* 202 U. S. 71 [6 Ann. Cas. 217, 50 L. Ed. 939, 26 Sup. Ct. Rep. 567, see, also, Rose's U. S. Notes]; see,

also, *Prost* v. *More*, 40 Cal. 347; *Mission Brewing Co.* v. *Rickert*, 39 Cal. App. 668 [179 Pac. 720]; *Teachout* v. *Bogy, supra*).

As to the findings of fraud and the dual secret agency of Gross, the evidence shows that Gross had been in the employ of appellants almost continuously from July 1, 1921, until the purchase contract of September, 1923, in charge of the exploitation and promotion work of the Franklin Amusement Corporation in the operation of the Franklin Theater. The appellants were experienced theater operators, a dozen theaters having been bought and sold by them. Oliver Kehrlein managed the Franklin Theater from the time that the Kehrleins bought the corporation stock in September, 1918, until September, 1923. Tatterson and Maurer were in the automobile stage business, wholly inexperienced in the theater business, and Gross first met Tatterson in May, 1923, and Maurer in July, 1923, the meeting with Tatterson occurring through the solicitation of theater screen advertising from him by Gross. During the time of Gross' employment, appellants had changed managers of the theater, and Gross had complained to Oliver Kehrlein because the latter had not given the former the appointment. Kehrlein testified that in his opinion Gross was a good publicity and exploitation man, but not competent to manage the theater. Gross conceived the idea of finding a buyer of the corporation, and becoming manager for the new owner. Gross asked Oliver Kehrlein if he would sell, and the latter said he would. Kehrlein testified: "The idea of selling stock to Tatterson, Maurer and Gross first came to me in June, 1923, when Gross came to me. I knew that Gross was seeking to buy from me on behalf of Tatterson and Maurer when he first informed me before I went to Alaska." When Gross learned that Kehrlein would sell, he began endeavors to sell to Tatterson. A few weeks prior to the time that Gross first broached the subject of sale, the appellants had optioned "all of the capital stock" of the corporation to one Eckstein, at a price of $52,500. Eckstein did not go through with the deal. It was a few weeks later that Gross approached Kehrlein. Kehrlein testified: "Gross asked me how much do you want for your theatre, and I said I would like to get about $55,000.00 for it." Gross

stated that he would expect a selling commission from appellants. Gross testified: "I asked Kehrlein what I was going to get out of the transaction, and he told me that he would not name any specific sum, because he did not know how the deal would work out, and on what terms the deal would be consummated, and how much cash he would get, and therefore he was not in any position to state any definite sum, but to go ahead and do my best and he would take care of me in the end." Gross then fixed the price terms on which the sale was ultimately made—$10,000 down and $700 a month until $90,000 was paid, with interest at seven per cent on deferred payments.

Hence the situation was that Gross was "to go ahead and do his best" for the Kehrleins and receive a commission, the size of which depended on how good a deal he made for the Kehrleins. Upon being named a selling price of $55,000, he proposed and induced respondents, with whom he was to be associated in the business and who were to give him a third interest because of his experience and who reposed confidence in him and trusted him, to contract to pay for the stock $90,000. Oliver Kehrlein also testified that "he (Gross) conveyed the impression to me that I was to retain the stores." These were the two stores that ultimately under the contract of sale the buyers caused the corporation to sublet to the Kehrleins for $1 per year, and which Kehrlein testified: "I was planning to get $250.00 or $300.00 a month for ten years in exchange for a dollar a year." Adding the profit to the Kehrleins of these stores at Oliver Kehrlein's lowest estimate of $3,000 per year to the contract, Gross secured for them considerably in excess of $100,000 for the corporation stock which they were willing to sell and had shortly before contracted to sell for $52,500. This evidence is sufficient to support the finding that Gross was secretly the agent of appellants.

In support of their contention that the evidence does not support the finding of fraud and misrepresentation as inducing respondents to enter into the contract, appellants cite *Southern Development Co.* v. *Silva*, 125 U. S. 250 [31 L. Ed. 678, 8 Sup. Ct. Rep. 88, see, also, Rose's U. S. Notes], quoted approvingly in *Oppenheimer* v. *Clunie*, 142 Cal. 318 [75 Pac. 901], holding that to justify a court of

equity in setting aside a contract on the ground of fraud "the complainant must show by clear and decisive proof: first—that the defendant has made a representation in regard to a material fact; secondly—that such representation is false; thirdly—that such representation was not actually believed by the defendant; fourthly—that it was made with intent that it should be acted on; fifthly—that it was acted on by complainant to his damage, and sixthly—that in so acting on it the complainant was ignorant of its falsity and reasonably believed it to be true."

Without further lengthening this already lengthy discussion of the numerous questions presented, it may be said that the facts in the record showing fraud and misrepresentation measure up to the standard quoted from *Southern Development Co.* v. *Silva.* Aside from the testimony set out, the record shows that appellants represented to respondents Tatterson and Maurer through Gross, whom the court found to be the secret agent of appellants, that the theater of the Franklin Amusement Corporation had always been a paying business; that they had made a great deal of money out of moving pictures and that the corporation was free of all debt, when as a matter of fact the theater had been a losing venture during all of the time appellants had conducted it and was not free from debt. This the books of the company disclosed when produced at the trial, which books appellants refused to permit respondents to inspect until they were produced in court, as also is this loss disclosed by the income tax returns made for the corporation by appellants as its officers. These misrepresentations respondents testified were not discovered by them until the date of serving the notice of rescission. ▮▮▮ Appellants, however, urge that respondents have not acted promptly upon discovering the misrepresentations and that therefore the notice of rescission was too late, and point to *Gratz* v. *Schueler,* 25 Cal. App. 117 [142 Pac. 899], as laying down a rule of law which, if applicable to the facts in the present case, would require a holding here that the notice of rescission was not served with sufficient promptness. In *Gratz* v. *Schueler,* the representation was that a certain business (the exhibition of a panorama) had been earning $20 a day, while the first exhibition by the buyers brought in receipts of only

$12.50, the second exhibition brought in but seventy-five cents, and the third but fifteen cents. While the court did say, "The result of a single exhibition given by plaintiff prior to the purchase price should have been sufficient we think to put him upon further inquiry concerning the past earning capacity of the Panorama," the court, however, further says: "The evidence clearly and without conflict shows that the plaintiff did not rely upon and was not deceived by the statement that the panorama had been earning twenty dollars per day while owned and operated by the defendants," and the fact that he was not deceived by the misrepresentation was the basis for the decision in that case. There the facts are not analogous to the facts here. The policy of the theater in the present case was changed to a second-run house to handle it more economically and with less capital, which change was known to appellants.

When Gross first approached Oliver Kehrlein in the original negotiations he went to Kehrlein with a slip of paper containing an estimate of expense for running the house on a second-run principle and went over the figures with him.

Oliver Kehrlein testified that it takes a certain length of time to initiate the patrons of a theater in a change of policy, and that the Franklin Theatre covered a certain particular area; that it was not a neighborhood theater. The operation of the theater by respondents resulted in losses week by week for nearly the whole of the twenty weeks from October 14, 1923, to March 1, 1924. Oliver Kehrlein gave plausible explanations to Tatterson and Maurer concerning the losses. Maurer testified: "I used to meet Mr. Kehrlein in the office in the mornings and we discussed with him why the business was falling off, and he said you know that the street is being torn up, and the building on the other corner is being erected, and he says the sidewalk is blocked. He says, 'You have got to just keep up. You will come out all right. Just sit pretty.'" Tatterson testified: "Mr. Kehrlein explained that the excavation across the street and the opening of 15th street, and the fact of the building on the Alameda County Title Insurance Company building, and other obstructions, were responsible for the losses." Tatterson further testified: "I said nothing to Kehrlein or

anyone representing him, and did not intimate to him that I had been defrauded, because the things that were brought to my attention about the street opening and the building at the other corner seemed to be plausible reasons. I had been in business before when things were not always rosy, and I was hopeful that the excuses that were given was the real trouble, and that the people would come, but they never came and that is all there is to it.''

The losses continuing, Oliver Kehrlein advised respondents to change the theater back to a first-run house. This change back to a first-run house was made after four weeks of losses as a second-run house. When appellants took the theater back on March 1, 1924, they changed it to a third-run house.

Under these circumstances, *Gratz* v. *Schueler, supra,* is inapplicable. Respondents lost no rights in the operation of the Franklin Theatre for a period of twenty weeks, inasmuch as it would require an averaging over a period of a number of weeks' operation to determine what a motion picture house would do under the change of policy, and Oliver Kehrlein kept constantly in touch with the buyers and continually gave what, to the buyers, were plausible reasons for the continuance of the losses week after week. Of course, if respondents had had access to the true records of Franklin Amusement Corporation, the truth would have been disclosed to them at once, but the court found, and the evidence supports the finding, that those records were withheld from respondents for the purpose of concealing information from them.

Respondents were never fully or at all apprised of their rights, nor did they have sufficient or any knowledge of the truth constituting their title to relief prior to the time they served their notice of rescission on February 29, 1924. Tatterson testified: ''After me and my associates took possession of the Franklin Theatre, we lost money at once during the first four weeks of our operation but no suspicion entered my mind that the business was not as it had been represented.'' Maurer testified: ''I first discovered that we had been defrauded about the last part of February, 1924—February 29th. I had no suspicion prior to that time that we had been defrauded. We weren't in the theatre long

enough to find out, we hadn't run it long enough and could not tell whether the business paid.'' Tatterson thus described now the conclusion finally formed in his mind that he had been defrauded: ''I first discovered that I had been defrauded some time in the latter part of February— I should say about the 27th or 28th, I had not discovered it prior to that time. We needed the books in order to make tax returns to the Government and had been asking for the books so we could make proper report, and the place had been represented as free and clear and we had just been attached for a bill for the Kehrleins, and when the books were again refused I concluded there was something rotten in Denmark and declined to go any further. It was about the 27th or 28th of February, or the 26th, that I last asked for the books so we could make up the tax reports.''

This evidence supports the finding that plaintiffs Tatterson and Maurer did not discover the falsity of the representations until after February 25, 1924, and never waived their right to rescind the contract.

This disposes of the questions raised, and from what has been said it follows that we find no error in the record.

The judgment is affirmed.

Tyler, P. J., and Cashin, J., concurred.

A petition by appellants to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on February 23, 1928.

All the Justices present concurred.