[Civ. No. 4135. Fourth Dist. Dec. 8, 1950.]

IVAN MILLER et al., Respondents, v. EARL E. BUSBY et al., Appellants.

84

Wilson & Wilson for Appellants.

Johnson, Harmon, Stiriat & Henderson and Joseph T. Ciano for Respondents.

GRIFFIN, J.—Action for rescission. Prior to and in April, 1947, defendants were the owners of property known as "Tangled Pines Cabins," in the San Bernardino Mountains. This property consisted of four lots, each 40x100 feet, and contained 16 units. On October 10, 1946, Mr. Busby, hereinafter referred to as defendant, signed an exclusive listing authorizing one Jack Tibbetts to sell it. The listing reads in part as follows:

"Type—Mountain Motel. Amount . . . $140,000. Cash down, $70,000. Owner Occupied . . . Taxes $120.00 1945-46. Rental $35,820 1945-46 season . . . We, the owner, Earl E. and Leata V. Busby, of the following described real property . . . appoint Jack Tibbetts, Realtor, . . . exclusive agent . . . to sell said property for a period of 180 days from the date hereof and including the 1st day of April, 1947, for a total price of $140,000. TERMS $70,000 Cash . . . Balance

$700 monthly . . . Interest 6 per cent. LEGAL DESCRIPTION:
. . . Age New, 1 year average . . . Dated 10-4-46, at San Bno,
California. Signed: Earl E. Busby.

"In consideration of the above listing, the undersigned
agent agrees to use diligence in procuring a purchaser.

By Jack Tibbetts, Agent.
Expires April 1, 1947."

On April 13, 1947, plaintiff Ivan Miller, hereinafter referred
to as plaintiff, aged 29, who had saved up $20,000, was look-
ing for an auto court investment. He came in contact with
Tibbetts, who talked up this particular court. Tibbetts told
him of the listed price, the past income, and explained the
terms and conditions of the sale as reflected in the listing by
the owner. He showed him a brochure, prepared for advertis-
ing purposes by the agent and with the owners' approval,
reflecting the words in large headlines: "$25,000.00 NET IN-
COME 16 UNIT YEAR AROUND MOUNTAIN MOTEL COURT." The
following day defendant and his agent went with plaintiff
and his father to view the property. After considerable con-
versation and representations made by defendant as to the
income of the property, which we will later discuss, the parties
negotiated a sale of the property for $125,000, payable $20,000
in cash and the balance evidenced by a promissory note se-
cured by a trust deed and chattel mortgage for the balance,
payable $1,200 per month during the summer months and $500
per month during the winter months, with interest at 5 per
cent. Plaintiffs went into possession on May 1, 1947, and con-
tinually complained to defendants that the income from the
rentals was not according to the representations in the listing
and in accordance with the representations made by defendant.
Defendant blamed the off-season weather, etc. for the variance.
Plaintiffs, on December 31, 1947, served defendants with notice
of rescission. This action was instituted on February 21, 1948,
seeking cancellation of the note and trust deed and return
of the money paid.

After trial the court found, generally speaking, that de-
fendants falsely and fraudulently represented to plaintiffs
that the annual gross income from said property *had been* and
*was* $35,820; that they falsely represented that they received
as rental for the 1945-46 season a gross income in excess of
$27,000; that they falsely stated said property was patronized
by sportsmen and the general public, who came there in the
winter months to participate in skiing and other winter sports;

that defendants falsely represented to plaintiffs that said property had a value in excess of $130,000; that in truth and in fact the gross income from the 1945-46 season was only $8,602.39, plus $2,400 paid to the caretaker, the gross income for the year 1947, during the time plaintiffs were in possession was only $3,468, plus the said sum of $200 per month caretaker's charges; that in truth and in fact said property was not patronized by sportsmen as indicated; that the property did not have a value in excess of $130,000, but had a reasonable value of only $40,000, all of which facts defendants well knew at the time. It then found that such false representations were made with intent to deceive plaintiffs, who then had no knowledge of their falsity but relied upon and believed the representations made by defendants and accordingly entered into the agreement, executed the documents mentioned, and paid over the money; that the falsity of the statements was not discovered by plaintiffs until December 31, 1947; and that plaintiffs tendered to defendants everything of value received by them.

Prior to trial it was stipulated that plaintiffs should operate the motel and turn over all proceeds to a bonding company until the termination of the case. The trial court then entered an interlocutory judgment in accordance with these findings, ordered an accounting by the referee, and subsequently adopted the report of the referee, adopted further findings, and entered a final judgment embracing the provisions of the interlocutory judgment, and ordered cancelled all conveyances, including the trust deed and note and all indebtedness evidenced thereby. It gave judgment in favor of plaintiffs and against defendants for $20,429.25, covering the down payment and escrow fees, and the further sum of $6,000, being the amounts paid by plaintiffs, including principal and interest to November 10, 1947, and the additional sum of $1,040, being the value of plaintiffs' labor in placing improvements on the property after December 31, 1947. An offset was allowed defendants in the sum of $6,772.82, being the net profit realized by plaintiffs in their operation of the premises. The property was returned to defendants subject to a lien in favor of plaintiffs in the amount set forth. The appeal is from the interlocutory and from the final judgment as entered.

Defendants first raise the question of the sufficiency of the evidence to support the findings. A brief résumé of plaintiffs' evidence clearly shows evidentiary justification

for the court's finding, particularly in reference to the net income of the court. The listing itself, signed by defendants, showed: "Rental $35,820 1945-46 season" and the concession by all parties that the actual rentals for that season did not amount to that sum indicates a false representation on its face. Defendants' explanation of this statement is that certain of the cottages were under construction during that period and that they arrived at this figure by their record of past performances of certain cottage rentals and estimated what these additional cottages would have produced during that year had they been in operation.

The evidence definitely shows that neither plaintiff, his father, nor the real estate agent himself, ever believed that the figure given was only an estimate, but it affirmatively shows that they did believe that it was a true record of actual income for the season 1945-46.

After examination of the property by plaintiff, he said he could not see $130,000 valuation in the property. He was then told by defendant and his agent of the amount of net income from the property and accordingly that that income showed better than a 21 per cent return on that amount of investment. Plaintiff testified that he asked defendant for his books of account and an itemized return of the several units, as well as a statement of the total expenses for the season of 1945-46. The next day defendant came up with a group of cards which he said reflected the names of the occupants, cabin numbers and prices paid by them for the months of July, August, and September, 1946, and while these were not all of the cards, the ones he had with him reflected generally the income; that the remaining records were in storage or had been lost or were poorly kept by his mother-in-law, who managed the property at the time. He then produced a typed statement entitled: "Gross Income from Rentals . . . 5 summer months, 10 cabins rent for $10.00 per night or $60.00 per week, $12,000." Then follows a list of the remaining cabins and rooms comprising an average rate of from $5 to $15 per night, totaling $12,540, showing a gross return of $24,540. The winter months' rentals were described as "average income for the seven winter months, $11,280," both totaling $35,820 "annual gross income." The total annual expenses were itemized and amounted to $8,448. Then follows the statement: "Total net income $27,372—21% profit on investment of $130,000."

After analyzing this statement, plaintiff made a copy of it, made a deposit of $100 with the agent and returned to his home to discuss these figures with his wife. Thereafter, he sent the $20,000 and an escrow was opened. Without setting forth the items in figures, the actual gross receipts, after deducting expenses incurred by plaintiffs during their occupancy, were much less than those listed by defendant and fully support the court's finding that the net income for the season 1945-46 was only $8,602.39, as indicated.

The agent Tibbetts fully corroborated plaintiff's story. He testified that when defendants listed the property they had a price of $140,000; that he questioned the value unless the net income recited could be established to his satisfaction; that he asked defendant "for a profit and loss statement to substantiate the income . . . figures given me"; that the one shown to him was the one produced by the defendant and shown to him about one week after the listing was made; that he looked over the statement and said: "That certainly was a nice showing." Tibbetts then testified that he believed it was a statement of the *past income* of the properties and not an estimate, and stated he represented this income statement to Mr. Miller as a fact and not as an estimate, when inducing him to buy the property; that he told Miller $130,000 was not an unreasonable amount to pay for the property when it showed a net income of $25,000 or more, and that "Mr. Busby corroborated my statement." During the negotiations, plaintiff told defendant that all the money he had was the $20,000. Plaintiff testified that defendant then consented to reduce the price to $135,000 and allow an additional $5,000 reduction if plaintiff would assume the cost of repair work then going on, and that he would consent to a reduction of the down payment from $70,000 to $20,000.

It appears that after notice of rescission was sent to defendants, Busby came to Tibbetts inquiring about the statement he furnished him as to the profit and loss or income and expenses for 1945-46, and asked to have that statement returned to him; that Tibbetts told him he had given it to plaintiffs; that defendant then asked Tibbetts if he did not remember that defendant said that statement was only *an estimate*; that the statement "would be just half of this amount, and that double the amount would be the income"; that Tibbetts then told defendant, "No, Earl, I don't remember you making such a statement"; that defendant then asked him to "just think hard" and that Tibbetts replied:

"You wouldn't want me to lie about it would you, Earl?" and Earl said "No, . . . that he would like to have him see if he could remember him saying that."

On cross-examination, defendant was confronted with his net income tax statements for the years he was operating the motel. Suffice to say, the amount reported was much less than that indicated by the profit and loss statement furnished to Tibbetts and the plaintiffs.

There was evidence that the property was located several miles from any known ski or toboggan activities and there were no great demands for reservations for winter sports enthusiasts, as represented, during the plaintiffs' tenancy.

A real estate appraiser, who qualified as such, made a detailed written appraisal and testified that the reasonable value of the property on the date plaintiffs purchased it was actually $42,500, and that it had a monthly rental value of $1,372, with an anticipated yearly operating cost of $8,225.

Defendant insists that he was only quoting the potential value and estimated income of the property and not its actual net income for the year 1945-46. The trial court rejected this contention. Its finding on this conflict in the evidence cannot be disturbed on appeal. (*Chichester* v. *Seymour*, 28 Cal.App.2d 696 [83 P.2d 301].)

The next argument is that the evidence does not support the finding that Mrs. Busby made any representations, false or otherwise, and therefore she was not bound by any representations made by her husband; that even if the court was authorized to set aside the conveyance and note, it was not authorized, under the evidence, to render judgment against the wife for any amount or to order her to return the money paid by plaintiffs in the transaction. The claim is that the broker, Tibbetts, was not her agent, since she did not sign the written listing and had nothing to do with the transaction except to execute a deed of the property with her husband, to the plaintiffs, and to have a promissory note, in their favor, secured by a trust deed, returned to them as a part of the deal; that she never acquiesced in, ratified, nor consented to any false representations claimed to have been made by her husband, and accordingly she was not bound thereby; that since she held the property as "tenant in common" with her husband, she was not bound by his acts nor were his acts imputed to her; that no agency was established between defendant husband and his wife and since the "business of

agency'' relates to a sale of real property, the only method by which the husband could be appointed her agent was by ''an instrument in writing,'' and since no such writing existed, no valid agency was implied or inferred from the acts of the parties, citing sections 686, 1624, subd. 42309-10, and 2338 of the Civil Code, and such cases as *Pearis* v. *Covillaud,* 6 Cal. 617, 621 [65 Am.Dec. 543]; *Wagoner* v. *Silva,* 139 Cal. 559; *Most* v. *Passman,* 21 Cal.App.2d 729 [70 P.2d 271]; *Younis* v. *Hart,* 59 Cal.App.2d 99 [138 P.2d 323].

The manner in which defendants held title to the property is not clear. The complaint charges that subsequent to the time of this transaction Earl E. Busby and Leata V. Busby were the owners of the above described property which was occupied and operated by them as a resort motel; that these named *defendants* made the false representations. Their joint answer admitted the allegations of ownership; denied that defendants made any false representations but *they* admitted making representations that the property was patronized by sportsmen, etc., and denied such representations were false; *they* alleged that in respect to the past income ''these answering defendants'' fully revealed the records relating to the operation of the property and the gross income and expenses thereof; and that with respect to future income anticipated from said property it was clearly, definitely and positively stated by ''*these answering defendants*'' to plaintiffs that any and all statements made in connection therewith were matters of opinion and estimates, depending on future conditions. By cross-complaint both defendant Busby and his wife alleged they were the owners and holders of the promissory note and trust deed. The note recites that the promissors promise to pay ''Earl E. Busby and Leata V. Busby, husband and wife, as tenants in common'' the sum of $105,000. The trust deed recites that plaintiffs grant to the trustee the property involved and names defendants, husband and wife, as beneficiaries.

There is no evidence that defendants held this property as ''tenants in common.'' Section 687 of the Civil Code defines community property as that acquired by husband and wife or either, during marriage, when not acquired as the separate property of either. Section 686 of the Civil Code, cited by defendants, declares every interest created in favor of several persons in their own right is an ''interest in common, . . . *unless acquired as community property.*'' Under the circumstances the trial court would have been justified

in considering the property to have been community property. Defendants made no showing to the contrary. In *Stegeman* v. *Vandeventer*, 57 Cal.App.2d 753 [135 P.2d 186], this court held that in an action for damages for fraud, although defendant wife might not have been a party to the fraudulent representations which her husband made to plaintiff, she could not escape liability for the results of the fraud where she participated in the fraud by conveying the property in question to the plaintiff, where she accepted a deed to another property given in partial payment for the other property, as one of the joint tenants, and where she still retained that interest in the property; and that a husband or a wife may act as agent for the other. Such agency may be proved by circumstantial, as well as by direct evidence, and may be shown by less evidence than under other kinds of agencies, and may be established by proof of ratification of acts already performed without previous authority.

Even though the exclusive listing may have expired previous to the sale in the instant action, both defendants conducted their negotiations through the realtor and paid him a commission on the sale. That Tibbetts was the agent of defendant husband in the transaction cannot be doubted. (*Williams* v. *Marshall*, (\*Cal.App.) 223 P.2d 644; Restatement of the Law, Agency, p. 263, § 103; 2 Am.Jur. p. 183, § 228.) The case was tried in the trial court under the theory that Tibbetts represented both defendants in the action. No question as to this and no question about Tibbetts's authority was raised in the pleadings nor at the trial until on a motion for new trial, after defendants changed counsel. The pleadings, in effect, admit that *both defendants* did make certain representations to plaintiffs. If so, the wife's representations must have been through her husband, as agent, since she did not herself converse with plaintiffs. The husband had the management and control of the property during their joint ownership. Defendant's statement in reference to his ownership and control of the property is entirely inconsistent with the theory of tenancy in common. According to the briefs, Mrs. Busby sat in the courtroom during the trial and never once questioned Mr. Busby's authority to act as her agent. There is evidence here that the husband, previous to the making of the listing, discussed with his wife the sale of the court, and "we decided to sell the place." She joined

---

\*A hearing in the Supreme Court was granted on December 26, 1950.

with her husband in conveying the property to the plaintiffs and accepted the fruits of the transaction. At least a prima facie case of agency as between the wife and husband was made out. (*Hargrove* v. *Henderson*, 108 Cal.App. 667 [292 P. 148] ; *Engle* v. *Farrell*, 75 Cal.App.2d 612 [171 P.2d 588] ; *Macco Construction Co.* v. *Fickert*, 76 Cal.App.2d 295 [172 P.2d 951].)

▮ Counsel for defendants admit that they were unable to cite any case holding that the husband's authority to act for the wife in the sale of real estate under the circumstances here related "must be given by instrument in writing" and that such authority may not be implied or inferred.

This question was presented in *Benner* v. *Hooper*, 112 Cal. App. 53 [296 P. 660]. There the husband built a house on a lot where the title was standing in the wife's name and which was intended for the wife's own use and occupancy. She told her husband to put up a sign and try to sell it. He did so and misrepresented the fact as to its being located upon filled land. The husband and wife joined in the deed to the purchasers. Action was brought by the buyers against the husband and wife to recover damages sustained by reason of the fraudulent representations made by the husband. The lower court found that the wife had not given her husband *any written authority to act as her agent*; that she had no knowledge of the false representations made by the husband, and gave judgment against the husband and in favor of the wife. On a reversal of the judgment as to the wife, the court held that even though there was *no evidence of written authority,* the fact that the husband put up a sign and tried to sell it, and the fact that she ratified the sale by signing the deed and receiving the money established the fact that the husband was the agent. (See, also, *Quarg* v. *Scher*, 136 Cal. 406 [69 P. 96] ; *Hargrove* v. *Henderson, supra.*)

▮ In view of the evidence, the admissions in the pleadings, and the failure of defendants to raise this issue at the trial of the case, defendants should not now be heard to complain in that respect.

▮ The finding that plaintiffs did rescind promptly and accordingly did not waive their right to rescind is sufficiently supported by the evidence. It shows that plaintiffs repeatedly went to defendant and the agent during their period of occupancy for the purpose of obtaining defendant's records as to the names of the guests and the record cards of tenancies during 1945-46. Plaintiffs complained that their income from

the motel was not up to the representations made by the defendants. Plaintiff testified that defendant told him to wait until the ''snow flew'' and that people would then flock to the mountains. It was not until after that time passed that plaintiffs could make a complete comparison of the income for the period in question. It then showed about 31 per cent of the amount defendant represented as the net income and it was then that plaintiffs fully learned that they had been defrauded.

The question of waiver and laches is usually a factual question for the determination of the trial court. No abuse of discretion here appears. (*Tatterson* v. *Kehrlein*, 88 Cal. App. 34 [263 P. 285] ; 12 Cal.Jur. p. 799, § 60; *Hunt* v. *L. M. Field, Inc.*, 202 Cal. 701 [262 P. 730] ; *Williams* v. *Marshall, supra.*) The evidence supports the findings of the trial court.

Judgment affirmed.

Barnard, P. J., and Mussell, J., concurred.