[Civ. No. 11464. First Dist., Div. One.—May 7, 1941.]

STATE FINANCE COMPANY (a Corporation), Appellant, v. FLOYD N. SMITH, Respondent.

Carl H. Allen for Appellant.

Harry L. Noland for Respondent.

PETERS, P. J.—Plaintiff appeals from a judgment for defendant in an action brought to recover a deficiency judgment in the amount of $251.38. Defendant admitted executing a promissory note in favor of plaintiff in the amount of $468.72. The note was secured by a chattel mortgage on two trucks, one a Reo and one a Dodge. After repossessing these trucks and selling them there was a balance of $251.38 owing plaintiff, which was reduced by the sum of $40.79 during trial. The trial court found that at the time defendant executed the note and mortgage he received no consideration; that the note and mortgage were given by defendant without consideration; that defendant executed the note and mortgage upon the false and fraudulent representations of plaintiff.

One Pugh, who died prior to trial, was a dealer in used cars. The plaintiff finance company was the legal owner and Pugh the registered owner of a Reo truck. This truck had been repossessed by the plaintiff and had been placed on Pugh's lot for resale. Pugh had guaranteed payment of the balance due the finance company from the defaulting

purchaser. Defendant was a truck operator. He owned a Dodge truck but was unable to operate it because he was unable to pay the license and taxes due on it, totaling over $70. He discussed the matter with Pugh, and the latter suggested that defendant buy the Reo truck, and, in addition, borrow enough from the plaintiff to pay the license and taxes due on the Dodge. Defendant testified that in this conversation Pugh stated that he would take the matter up with Murphy, credit manager of plaintiff, and see if the transaction could be worked out; that two or three days later Pugh told him he had a letter from Murphy; that the letter stated "something to the effect they would sell me the truck for the $50.00 down but to put both trucks on the contract." As a result of these negotiations defendant executed the note in the sum of $468.72 on January 9, 1937. The note provided for installment payments monthly including interest at the rate of 12 per cent. Although the note was for $468.72, defendant actually received from plaintiff but $124 in cash. According to a statement rendered to defendant, the computations are as follows:

$124.00—advanced to defendant in cash
40.00—insurance premium
42.72—interest deducted in advance
10.89—expenses
251.11—apparently for purchase price of Reo
_____
$468.72

Of the $124 received by defendant, he immediately paid Pugh $50 on the Reo and used the balance to pay the license and taxes on the Dodge. The result is that he actually paid $301.11 for the Reo. ($251.11 plus $50.) To secure the promissory note defendant gave a chattel mortgage on both the Reo and the Dodge. The evidence shows that the Reo truck was valueless except for junk. It was towed to defendant's residence. It could not be operated because it had no usable tires and the engine could not be started. The evidence shows that prior to the sale to defendant Pugh suggested to a Mr. D. Dockery that the latter operate the truck. Dockery testified that he examined the truck "and it was in such bad shape I threw it back together and would not fool with it"; that Pugh told him "to throw it back together so we patched it up." The evidence also shows that the

cylinder head was cracked; that the pistons were full of water, and that the transmission was defective and had been welded to hold it together.

After signing the contract defendant made about $80 in installment payments, and then defaulted. About June of 1937 plaintiff repossessed both trucks and sold them, receiving $225 for the Dodge and $25 for the Reo, the latter being sold as junk to a wrecking company. It is for the balance due on the note that this action was brought.

We are faced with a situation where defendant actually received $74 from the transaction and a practically worthless truck. Plaintiff advanced $124 in cash to defendant, of which $50 was paid to Pugh. Plaintiff has received on the note some $80 in payments, plus $250 on the sale of the two trucks. Plaintiff now contends that it is entitled to a deficiency judgment of over $200. Its position is untenable.

■ As already pointed out, the trial court found that defendant received "no consideration" for the note and mortgage, and that they were given by defendant to plaintiff "without any consideration". That finding is plainly unsupported by the evidence. Without reference to the Reo truck, defendant did receive from plaintiff the sum of $124 in cash.

■ However, the court also found that the note and mortgage were executed upon the false and fraudulent representations of plaintiff. This finding is supported by the evidence. Pugh represented that usable tires would be placed on the truck. This promise was never performed and the circumstances demonstrate that when it was made there was no intent to perform it. Moreover, Pugh impliedly represented that the truck was usable. As a matter of fact, the truck was not only not in a usable condition, but Pugh knew that it was fit only for junk. Nevertheless, he sold the truck for over $300. There is another factor which tends to show fraud. ■ Although inadequacy of consideration alone is no defense to the enforcement of a contract voluntarily made (*Whelan* v. *Swain,* 132 Cal. 389 [64 Pac. 560]; *Tatterson* v. *Kehrlein,* 88 Cal. App. 34 [263 Pac. 285]), it is also true that gross inadequacy of consideration is some evidence of fraud. The rule, supported by cases from many states, is stated as follows in 17 C. J. S., page 475, section 128: "Where the inadequacy is so gross as to shock the conscience and common sense of all men, it may amount both at law and in equity

to proof of fraud, oppression, and undue influence." This rule was cited with approval and followed in *Herbert* v. *Lankershim*, 9 Cal. (2d) 409 [71 Pac. (2d) 220]. The rule is clearly applicable to the facts of this case.

Appellant urges, however, that, conceding the evidence shows that Pugh made fraudulent representations, there is no evidence to show that Pugh was the agent of plaintiff. This contention is based upon the fact that as part of the loan agreement defendant signed a document purporting to appoint Pugh his agent to negotiate the loan. This document is dated January 9, 1937, the same date as the note and chattel mortgage. It recites that defendant employs Pugh as his broker to arrange the loan; that Pugh is appointed agent of defendant to "collect" the loan from the plaintiff; that it is distinctly understood that Pugh is the agent of defendant "and shall not at any time be the agent of the lender"; that Pugh is acting "solely as the agent of" defendant and "is not acting for the lender in any manner". When this agreement was read into the record the trial court stated, "It all goes to show there are tricks in all trades . . . ".

A reading of this instrument, and a consideration of the surrounding circumstances, demonstrates that the agreement was drawn with the object of protecting plaintiff rather than for the purpose of describing the true relationship. If the relationship between plaintiff and Pugh was in fact one of agency, the provisions of the above-described agreement between Pugh and defendant would not bar defendant from showing the true fact. The so-called agreement is merely evidence of the relationship between the parties, it is not conclusive on that point. As opposed to the terms of this agreement, the evidence shows that plaintiff was the legal owner of the Reo truck, and that Pugh was the registered owner. The truck had been repossessed by plaintiff for default of a prior purchaser on his obligation to plaintiff, which had been guaranteed by Pugh. Defendant testified that when Pugh suggested he buy the Reo truck, Pugh told him that "The State Finance has eleven more trucks down there"; that "I will take it up with Murphy" (credit manager of plaintiff); that two or three days later Pugh showed him a letter from Murphy which stated that "they" would sell him the truck for $50 down, but both the Reo and the Dodge would have to be put on the contract. The evidence also

shows that plaintiff sold its legal title to the Reo truck to defendant for $251.11, and that Pugh sold his registered title for $50. The evidence is clearly sufficient to support the implied finding that plaintiff and Pugh were jointly interested in the sale of the repossessed truck to defendant, and that in negotiating that sale Pugh was acting as the agent of plaintiff. The trial court obviously believed that the agreement above-referred to was a mere subterfuge to protect plaintiff. The evidence shows that this belief was justified.

Plaintiff also urges that there is no evidence that defendant relied on any fraud or misrepresentation of Pugh, inasmuch as the evidence shows that defendant inspected the truck. Defendant, in response to a question as to whether he had inspected the truck, stated "No, I didn't". He also testified that in checking a used truck, "You can't check anything without checking it piece by piece. All you can do is to go down to a man you figure is reliable and ask if it is O. K. and you have his word for it." Plaintiff also relies on the fact that the application for the loan attached to the agreement signed by Pugh and defendant lists the various major parts of the truck, and that opposite each named part are the words "New—Good—Fair—Old—Damaged". A check mark in the "Good" column appears as to each part. Defendant testified that he did not make those check marks, and that he did not see them on the agreement when he signed it. The evidence supports the inference that they were added after the agreement was signed.

The transaction disclosed by the record is an inequitable and unconscionable one. The law would indeed be impotent if it were powerless to grant relief from such a transaction. Fortunately, the power is not lacking to do justice in this case.

The judgment appealed from is affirmed.

Knight, J., and Ward, J., concurred.